UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

JORGE RUIZ,

       Plaintiff,                            06 Civ. 9868 (CM)(LMS)

vs.                                     **SECOND AMENDED**
                                     **COMPLAINT**

COUNTY OF ROCKLAND, MARY ANN
WALSH-TOZER, sued in her individual
capacity,

       Defendants.
--------------------------------------------------------x

## I. **PARTIES**

1. Plaintiff, Jorge Ruiz [hereinafter "Ruiz"], is an Hispanic male of dark complexion whose national origin is Puerto Rican.

2. Plaintiff is of legal age and a resident of the County of Rockland.

3. Defendant County of Rockland is a municipal corporation organized and operating pursuant to the laws of the State of New York and the United States. It may sue and be sued.

4. Defendant Mary Ann Walsh-Tozer [hereinafter "Walsh-Tozer"] is a Caucasian who works as Commissioner of Mental Health for the County of Rockland.

5. Walsh-Tozer is sued in her individual capacity for discriminatory acts taken under color of state law.

## II. **JURISDICTION**

6. As plaintiff contends that defendants violated rights provided him by the United States Constitution as well as federal law, this Honorable Court has subject matter jurisdiction pursuant to 28 U.S.C. secs. 1331, and 1343 (3) & (4).

## III. **FACTUAL ALLEGATIONS**

7. Plaintiff worked for defendant Department of Mental Health for more than ten [10] years, commencing as a Mental Health Worker on March 25, 1996.

8. Plaintiff repeatedly received superlative performance evaluations.

9. In April 2000, his superior wrote that "Jorge is very conscientious and dependable and provides a safe and therapeutic environment for patients..."

10. In March 2004, another supervisor wrote, "Jorge is a dependable, reliable worker. He's developed quite a knowledge base over the years. He's willing to take on responsibility. His bilingual ability has proved invaluable in providing quality patient care in our diverse community."

11. On November 10, 2004, Walsh-Tozer approved plaintiff's contingent-permanent appointment to Mental Health Worker II effective November 1, 2004 and placed him on a probationary period of between eight [8] and twenty six [26]

weeks.

12. Two weeks following this promotion, defendant Walsh-Tozer suspended plaintiff with pay and without any written reason.

13. In the notice of suspension, defendant Walsh-Tozer claimed that someone had made a "serious allegations" against plaintiff, causing his suspension.

14. In fact, the suspension was baseless and recklessly implemented without any reasonable basis in fact.

15. Likewise, on December 17, 2004, defendant Walsh-Tozer again suspended plaintiff without pay, this time "[b]ased on an allegation made by a patient and pending an investigation of this matter."

16. For three and one-half weeks, defendants gave plaintiff no information concerning the allegation.

17. After three and one-half weeks, defendants' agents called plaintiff and told him he allegedly fondled a female patient and lifted her shirt.

18. Plaintiff denied these allegations and, on January 13, 2005,gave a written statement denying that he had engaged in any such conduct.

19. On February 7, 2005, defendant Walsh-Tozer returned plaintiff to work and advised him that the investigation of "a recent patient allegation has been

completed."

20.   In toto and between these two "allegations", plaintiff was suspended for eight weeks following his promotion.

21.   On February 17, 2005, defendant Walsh-Tozer extended plaintiff's probation until June 29, 2005.

22.   On March 8, 2005, plaintiff's supervisor provided him a performance evaluation which includes a narrative that stated, "Mr. Ruiz is a caring and competent MHWII.  He is aware of unit environment and patient needs, He works hard and is a good example to other MHW staff. He is an asset to the MH inpatient unit."

23.   On June 24, 2005, plaintiff's supervisor again evaluated his performance and wrote:  "Jorge is extremely dedicated.  He is extremely reliable and supportive.  His bi-lingual capacity has proven invaluable over the past years. He has shown that he can capably supervise his former peers."

24.   On June 28, 2005, three days after this evaluation, defendant Walsh-Tozer suspended plaintiff "[b]ased on the seriousness of allegations made against [him]."

25.   When plaintiff reported to a meeting on June 28, 2005, he asked the four supervisors present why he was being suspended and none provided any

reason.

26.   Though suspended with pay on June 28, 2005, plaintiff did not timely receive his pay check for the following pay period.

27.   As a consequence of this suspension, plaintiff starting taking medication to relieve his anxiety; he had difficulty eating and sleeping.

28.   While acting as a MHW II, plaintiff reported to his superiors that certain subordinates, particularly E., who is Caucasian, was repeatedly insubordinate, did not follow his directions and abandoned her post.

29. Plaintiff's supervisors did not suggest taking any disciplinary action against E. and she continued to behave in a manner contrary to department rules and regulations.

30.   For at least the five years prior to and including 2005, plaintiff observed Mental Health workers, including supervisors, routinely engaging in affection displays in front of patients.

31.   Supervisors both engaged in this conduct themselves and were present when such conduct was occurring.

32.   Defendants initiated no disciplinary action against any of the overwhelmingly Caucasian workers who engaged in such practices.

33.   Plaintiff observed one Mental Health Worker, M., who is Caucasian,

frequently hug and kiss other employees in plain view of supervisors with no consequence.

34.  In early May 2005, M. approached plaintiff and advised him that she had just been interviewed by a supervisor, Nancy P.

35.  M. advised plaintiff that Nancy P. had questioned her concerning an allegation that she, M., was dating one of the inpatient unit patients.

36.  Within ten days, plaintiff heard other rumors concerning M.s' alleged relationships with patients.

37.  Plaintiff confronted M. concerning these rumors and M. denied them all.

38.  In June 2005, after being accused by her superiors of having inappropriate relations with patients, M. accused plaintiff of sexually harassing her.

39.  Defendants commenced an investigation into this allegation and a related like allegation by another female, E.

40.  Plaintiff did not learn of these allegations until about one month after they were made.

41.  During that time period, he was banned from contact with anyone from the in-patient unit.

42.  In late July 2005, plaintiff was interviewed by a County investigator and truthfully denied engaging in any sexual harassment of either woman.

43.  During this interview, plaintiff told the County investigator that his supervisor, George Bates, observed kissing and hugging amongst staff, that such behavior commonly occurred in and around the nursing station and that Bates himself engaged in such behavior.

44.  Plaintiff also advised the County investigator that he had reported to his supervisor, Bates, that M. was dressing inappropriately at work and that people could see her underwear.

45.  On October 31, 2005, after interviewing nine unit employees, Margot Vasquez, the Director of Office of Employee Rights and Equity Compliance reported her conclusions on the sexual harassment complaints of M. and E.

46.  This report concluded that these women's "allegations of sexual harassment were not corroborated by other employees."

47.  Despite this conclusion, the report recommended that plaintiff be transferred to another position and closely supervised.

48.  After completion of this report, plaintiff was permitted to return to his former position.

49.  Having received this report, defendant Walsh-Tozer tasked Kayeton

Kurowksi, her clinical assistant, to review the statements which Vasquez had

taken during *her* investigation and note to Walsh-Tozer any concerns which he

had about what was presented.

50.  Kurowski claims that in reviewing the report, he became concerned that

departmental policy was not followed regarding "the reporting of incidents of

patient abuse."

51.  Kurowski marked three statements from a report plaintiff had furnished

Vasquez.

52.  The first statement reads as follows:  "M. Told me that Nancy [a

reference to M.'s second line supervisor] had questioned her because one of the

patients [B.W.] had told staff that she [M.] was dating a patient, and she was afraid

she would lose her job."

53.  From this statement, Kurowski baselessly concluded that Ruiz had an

obligation to report to Nancy or a like supervisor that M. had told him was dating

a patient.  No reasonably competent person could so conclude or could ratify any

such conclusion.

54.  Kurowski also identified a second statement in plaintiff's statement

which, he claimed, showed that Ruiz had knowledge that M. was engaging in a

dating/sexual relationship with a patient, obliging plaintiff to report this to a

supervisor.

55.  That statement, as written by plaintiff, reads as follows:

"Approximately a few days later, I was told by one of the patients on the unit that

M. had sex with a patient [E.H.] while he was a patient on the unit.  I was told that

E.H. had been demanding to have his room changed to the annex to be closer to

M's office.  Also about this time I had worked an overtime, and Roland Hill [a

supervisor] of the evening shift told me that he was going to talk to M. because

she was spending too much time around E. and that she often stayed past her usual

hours to do so.  I was also informed by Mike J., mental health worker, that E. had

told him that he had seen M's surgical scars (from her breast reduction surgery

from last year) and described their location."

56.  Plaintiff's statement continued, "I had asked M. if these rumors about

her and E. were true and she denied it.  I believe her because I didn't believe she

would do that."

57.  The third statement Kurowski highlighted related to plaintiff's

observation of M. kissing and hugging male mental health workers and engaging

in other physical contact with them in front of unit patients.

58 At all relevant times,  Roland Hill was a supervisor superior in rank to

plaintiff.

59.  At all relevant times, Nancy Panicucci was a supervisor superior in rank to plaintiff.

60.  Based on his claim that Ruiz was obliged to report the three cited instances of M.'s "sexual" contact in front of or with inmates to his superior and failed to do so, Kurowski recommended administrative action be taken against plaintiff.

61.  Despite Vasquez's conclusion that sexual harassment charges against plaintiff were not warranted, Kurowski also recommended that "further administrative action being taken against him be revisited, as it appears indicated, in my opinion."

62.  Before making these recommendations, Kurowksi met with plaintiff.

63.  During this meeting, Kurowski never asked plaintiff why he did not report the three cited matters.  When plaintiff started to explain his behavior, Kurowski stopped him.

64.  Having been tasked to review the witness statements obtained by Vasquez, Kurowski did not interview George Bates, a white head nurse and supervisor, who Ruiz had reported witnessed and engaging in kissing and hugging behavior in front of patients.

65.  Kurowski made no recommendation that Bates be brought up on any

charges and he was not.

66.  At the time he recommended to defendant Walsh-Tozer that plaintiff be subject to administrative action, Kurowski knew that Nancy Panicucci had met with M., as related in para. 52 above, because it had been reported up the chain of command that M. was behaving inappropriately with a patient

67.  After this meeting between Panicucci and M., as Kurowski understood when he recommended administrative action against plaintiff, M. told plaintiff that she *had already* met with Panicucci and been questioned about her allegedly improper relationship with a patient.

68.  Before recommending administrative action against plaintiff, Kurowski had confirmed with Panicucci that she had met with M. concerning her possibly inappropriate relationship with a patient, exactly what M. told plaintiff.

69.  On December 1, 2005, defendant Walsh-Tozer propounded disciplinary charges against plaintiff and suspended him without pay.

70.  After a four day hearing and the submission of briefs by both parties, on June 6, 2006, the hearing officer, Ira Lobel, Esq., appointed by defendant Walsh-Tozer issued a report and recommendation.

71.  With respect to the specification that charged plaintiff with failing to report "an allegation that a co-worker M.D. was dating a patient B.W. in violation

of department policy," Lobel concluded, "Grievant could reasonably believe he was under no obligation to report anything."

72.  With respect to plaintiff's failure to report the knowledge related above in para. 55, Lobel found that plaintiff had a duty to report that information to his superiors, found not credible plaintiff's claim that his superiors, specifically Bates, knew this information, and proposed a thirty day suspension for the failure to report.

73. With respect to plaintiff's failure to report the generalized kissing and hugging which he told Vasquez was commonplace at the facility, Lobel concluded that "supervisors and other employees were also aware of the conduct and therefore were similarly responsible for reporting such behavior.  In a situation where inappropriate conduct was allowed to continue, it is necessary that the Grievant and other employees be notified that such conduct will not be tolerated and, if continued, will result in disciplinary action.  Especially in a situation where such conduct was allowed to exist, discipline for not reporting this conduct is not appropriate."

74.  In his findings of fact, Lobel wrote, "Jorge Ruiz is guilty of charge II. However, the matters that Grievant was accused of not reporting were common knowledge among the staff and Jorge Ruiz was singled out for discipline.  The

punishment for the offense should be a written reprimand." [emphasis added].

75. In fact, defendants did not prefer charges against any of the Caucasian workers who participated in the sexual conduct plaintiff observed and reported.

76. Defendants did not prefer charges against any of those who likewise failed to report the sexual contact which they observed and which was common in the unit.

77. The only Hispanic in his unit, plaintiff was singled out for the presentation of disciplinary charges because of his race and national origin.

78. The other workers who defendants failed to charge and who were similarly-situated are white.

79. On August 18, 2006, defendant Walsh-Tozer baselessly overturned the findings made by the hearing officer, concluding that "your knowledge of the extent and depth of the misconduct was unique and that, as a supervisor, your failure to report perpetuated misconduct you knew to be wrong and potentially injurious to both staff and patients" and terminating his employment.

80. Defendants have never treated a Caucasian MHW I or II as it has treated plaintiff.

81. In propounding disciplinary charges against plaintiff in December 2005, defendants claimed that he had raped a mentally ill patient five years before.

82.  The agency's own ombudsman had spoken with this patient within months of this alleged act and had rejected her claim of sexual misconduct [though she did not then accuse plaintiff of rape] as totally lacking in credibility.

83.  Plaintiff has no history of sexually abusing anyone.

84.  Plaintiff never had any sexual contact with this mentally ill woman who has accused numerous men of sexually abusing her.

85.  Defendants intentionally brought such an outrageous claim against plaintiff out of actual maliciousness and spite based on his national origin and race.

86.  Plaintiff's termination represented the culmination of profoundly biased treatment of him on the basis of his national origin and race.

87.  By dint of said conduct, defendants have caused plaintiff substantial pecuniary and non-pecuniary damages.

88.  Plaintiff has attempted to mitigate his damages.

88-A.  Plaintiff timely filed a charge of race and national origin discrimination against defendant County with the EEOC and received a right-to-sue notice from the Department of Justice on March 21, 2007.

89.  By selectively prosecuting plaintiff and then terminating him, defendants have caused plaintiff severe anxiety, distress, depression, caused him

to take medication and substantially affected him.

## CAUSES OF ACTION

90.  Plaintiff incorporates paras. 1-90 as if re-written herein.

91.  By selectively prosecuting plaintiff, defendants violated his right to equal protection of the laws and discriminated against him on the bases of his race and national origin in contravention of the equal protection clause of the Fourteenth Amendment, as made actionable against these defendants pursuant to 42 U.S.C. sec. 1983, and 42 U.S.C. sec. 1981.

92.  By terminating plaintiff despite the findings of the hearing officer, who recommended a thirty days suspension [which plaintiff had already served], defendants violated his right to equal protection of the laws and discriminated against him on the bases of his race and national origin in contravention of the equal protection clause of the Fourteenth Amendment, as made actionable against these defendants pursuant to 42 U.S.C. sec. 1983, and 42 U.S.C. sec. 1981.

93.  By dint of the foregoing, defendant County discriminated against plaintiff on the basis of his race and national origin in violation of Title VII of the Civil Rights Act of 1964, as amended.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that this Honorable Court:

a) accept jurisdiction over this matter;

b) empanel a jury to fairly try this matter;

c) award to plaintiff $3,000,000 in compensatory damages to be paid jointly and severally by defendants;

d) award to plaintiff $2,500,000 in punitive damages against defendant Walsh-Tozer;

e) order defendants to reinstate plaintiff to his position as MHW II;

f) order defendants to pay the reasonable attorneys fees and costs arising from the prosecution of this matter and

g) enter any other order which the interests of law and equity require.

Respectfully submitted,

CHRISTOPHER D. WATKINS (2240)

Counsel for Plaintiff

SUSSMAN & WATKINS
PO Box 1005
Goshen, NY 10924
(845) 294-3991

Dated: March 28, 2007