UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JORGE RUIZ,

                      Plaintiff,

        - against -

COUNTY OF ROCKLAND and MARY ANN
WALSH-TOZER, sued in her individual capacity,

                   Defendants.
-------------------------------------------------------------------X

**LOCAL RULE 56.1
STATEMENT**

06 CIV 9868 (KMK/LMS)

      Pursuant to Local Rule 56.1, defendants County of Rockland and Mary Ann Walsh-Tozer herein submit the following statement of material facts as to which there is no genuine issue to be tried:

      1.      The matter at bar arises from plaintiff's termination from employment as a Mental Health Worker II with the Rockland County Department of Mental Health.  (Exhibit "UU" at Paragraph 92. [1])

**Plaintiff's Hiring By, And Promotion Within, The
<u>Rockland County Department of Mental Health</u>**

      2.      On February 14, 1996 plaintiff applied for a job as a Mental Health Aide with the County of Rockland.  (See Exhibit "A" at p.11, lines 16-20; Exhibit "B")

      3.      The job of Mental Health Aide involved assisting nurses and mental health patients at the Robert L. Yaeger with the cleaning, shaving, grooming and general care of the patients. (Exhibit "A" at p.10, lines 3-9)

      4.      Plaintiff was interviewed for the position of Floating Mental Health Aide position by Diana Daws, a Caucasian woman. (Exhibit "A" at p. 12, lines 13-23)

---

[1]  All references to exhibits refer to those annexed to the attached Affidavit of Eric Dranoff.

5.      On March 21, 1996, plaintiff's application for employment as a Mental Health Aide was approved. (Exhibit "C")

6.      On March 27, 1996, Commissioner Walsh-Tozer sent plaintiff a letter advising him of his appointment as a part-time Mental Health Aide and, in that letter, offered her congratulations. (Exhibit "D")

7.      On April 25, 1996 defendant Mary Ann Walsh-Tozer promoted plaintiff to the position of permanent Mental Health Aide. (Exhibit "E")

8.      In early 1997, plaintiff intervened in a physical altercation at the "Detox Unit" of the Department of Mental Health. (Exhibit "A" at p.41, line12-p.42, line 2.)

9.      On or about February 7, 1997, plaintiff received a "Note of Thanks" from Commissioner Walsh-Tozer with regard to this incident. (Exhibit "F"; Exhibit "A" at p.38, line 18-p.40, line 9 and p.41, lines 12-14.)

10.      The February 7, 1997 note stated:

> I would like to thank you all for your prompt response to the Detox Unit on January 9th.  It is very reassuring to know that we have a staff as competent and responsible as you are.

(Exhibit "F"; Exhibit "A" at p. 41, lines 12-14.)

11.      This February 7, 1997 note was made part of plaintiff's permanent personnel folder. (Exhibit "F")

12.      This letter made plaintiff feel that he was appreciated. (Exhibit "A" at p.40, lines 10-16.)

13.      On May 30, 1997 Commissioner Walsh-Tozer presented plaintiff with a Certificate of Recognition for "Work Performance of the Highest Quality". (Exhibit "G"; Exhibit "A" at p.35, line 7-p. 36, line 2; p. 37, line 13-p. 38, line 4; p. 38, lines 6-7)

14.     On January 12, 2000 Commissioner Walsh-Tozer promoted plaintiff to the position of Mental Health Worker I. (Exhibit "H"; Exhibit "A" at p.28, lines 12-15)

15.     On November 1, 2004, Commissioner Walsh-Tozer promoted plaintiff to the position of Mental Health Worker II.  This promotion was memorialized in a November 10, 2004 letter in which Commissioner Walsh-Tozer congratulated plaintiff. (Exhibit "I"; Exhibit "J"; Exhibit "K")

16.     Plaintiff's promotion included a pay raise from $15.40 per hour to $16.25 per hour. (Exhibit "J")

17.     From the time that he was hired through November 15, 2004 plaintiff received satisfactory performance evaluations. (Exhibit "S")

18.     Throughout the period of his employment with the Rockland County Department of Mental Health, Commissioner Walsh-Tozer never said anything of a discriminatory nature to plaintiff. (Exhibit "A" at p.17, lines 2-8; p.42, lines 19-25; p.58, lines 4-8; p.104, line 25-p.105, line 7; p.137, lines 18-20.)

19.     Plaintiff has never seen any writing in which Commissioner Walsh-Tozer wrote anything negative about people of Puerto Rican heritage or any other persons of color. (Exhibit "A" at p.140, lines 2-9.)

20.     From the date plaintiff was hired as a Mental Health Aide through October 31, 2005 Commissioner Walsh-Tozer never did anything to plaintiff that he considered to be discriminatory. (Exhibit "A" at p.105, lines 16-20.)

**Plaintiff's Training In Incident Reporting And Sexual Harassment**

21.     Upon being hired, plaintiff was provided with a folder containing a Code of Ethics. (Exhibit "L")

3

22.     Plaintiff attended training in sexual harassment prevention, sexual abuse and the County policy regarding sexual harassment and incident reporting. (Exhibit "M"; Exhibit "N")

23.     On March 25, 1996, plaintiff received Department of Mental Health Employee Guidelines. (Exhibit "O")

24.     The Department of Mental Health Employee Guidelines specifically prohibit fraternizing with patients. (Exhibit "O")

25.     Plaintiff acknowledged receipt of these guidelines by his signature. (Exhibit "O")

26.     Plaintiff was also provided with the County of Rockland Department of Mental Health Clinical Procedure Manual. (Exhibit "P")

27.     On February 16, 2000, plaintiff signed a statement confirming that he had been provided with, and read, the Clinical Procedure Manual, and that he understood it was his responsibility to follow the procedures set forth therein. (Exhibit "P")

28.     The County of Rockland Department of Mental Health Clinical Procedure Manual sets forth Incident Reporting Procedures for Psychiatric Inpatient Service, which state in part:

**Policy**

It is the responsibility of the staff of the Department of Mental Health to follow the established procedures for the reporting of patient related incidents  This procedure applies to the Psychiatric Inpatient Service of RCDMH.

**Procedure**
*Serious Incidents*

1.   Definition of Serious Incidents:   All patient related incidents, including incidents involving patients discharged within thirty days...

   d.   Allegations of abuse or neglect by an employee.  These include... sexual abuse

2. Verbal Reporting: The person responsible for the Unit's operation at the time of the incident must attempt to notify, by phone, the following individuals of all serious incidents (immediately).

    a.   For all... allegations of abuse or neglect by an employee... Call or page the Director of Hospital Services...

    c.   For all allegations of alleged or apparent neglect or abuse by employees:   Call the Program Administrator, Acute Care Services."

(Exhibit "P")

29.    In addition, the County of Rockland's Department of Mental Health Ethics Policy Statement provides in part:

    1.   Staff must abide by all policies, rules and regulations of the Rockland County Department of Mental Health and the County of Rockland.

    2.   Staff must follow their professional Code of Ethics as well as the County of Rockland's Code of Ethics and the Department of Mental Health Ethical Policy Statement.

    4.   Staff must protect patient rights.

    7.   Staff is prohibited from physically, emotionally or sexually abusing patients.  Staff is prohibited from humiliating, threatening and/or exploiting patients.

    8.   Staff should not demean patients.

    9.   Staff should never exploit the vulnerability of patients.

    12.   Staff must not engage in any romantic and/or sexual activity with patients under their care for a period of one (1) year following termination of treatment.

    20.   Staff must report ethics deviations to supervisory personnel.

(Exhibit "Q")

30.    By Executive Order No. 2-2003, the County of Rockland established the County of Rockland Departments of Health, Hospitals and Mental Health Code of Conduct Integrity Handbook.  (Exhibit "R")

5

31.    The Handbook expressly states:

> It is the duty of every employee and agent to report any actual or
> suspected violations of the Code (or internal policies and procedures,
> federal and State laws, employee handbooks, etc). If you are aware of
> actual or suspected misconduct and you fail to report it, you will be
> subject to disciplinary action, up to and including termination.

(Exhibit "R")

32.    From the time that he was hired plaintiff was aware that sexual relations between

an employee and a patient constituted patient abuse and was required to be reported.  (Exhibit

"A" at p.103, lines 21-25; p.104, lines 2-6; p.155, line 8-p.156, line 2; p.158, lines 2-14; p.159,

lines 6-11.)

**Patients' Allegations of Rape By Plaintiff and Co-
Employees Allegations of Sexual Harassment By Plaintiff**

**The First Rape Allegation**

33.    On November 15, 2004 a patient, ███., alleged that plaintiff had raped her.
(Exhibit "T")

34.    Following this allegation plaintiff was suspended with pay.  (Exhibit "U")

35.    Kayeton Kurowski, then Clinical Assistant to Commissioner Walsh-Tozer,
conducted an investigation into this allegation.  (Exhibit "T")

36.    After the investigation, Mr. Kurowski recommended that no further
administrative action be taken.  (Exhibit "T")

37.    Thereafter, Commissioner Walsh-Tozer lifted plaintiff's suspension and permitted
him to return to work.  (Exhibit "V"; Exhibit "UU" at paragraph 19.)

**Two Female Co-Employees Allege Sexual Harassment**

38.    In June 2005, plaintiff's female co-employee, ███., approached a Psychiatric
Social Work Supervisor complaining that plaintiff was sexually harassing both ███. and another

6

female employee, ███. (Exhibit "W")

    39.    ███.'s complaint was then brought to the attention of Nancy Panicucci, Director of Acute Care, who met with ███. and ███. (Exhibit "W")

    40.    In addition to ███. and ███.'s complaints of inappropriate sexually harassing conduct, ███. advised Ms. Panicucci that plaintiff had been having an affair with a 21 year old female subordinate, ███. (Exhibit "W")

    41.    ███. advised Ms. Panicucci that plaintiff was angry with ███. because he believed that she was responsible for having ███. fired. (Exhibit "W")

    42.    Plaintiff had an extramarital sexual affair with co-worker ███. and had intimate sexual relations with her in public parks on at least two occasions. (Exhibit "A" at p.241, line 2-p.244., line 11.)

    43.    As required under the Rockland County Equal Employment Opportunity Policy ("RCEEOP"), Ms. Panicucci forwarded ███.'s and ███.'s sexual harassment claims to the County of Rockland Office of Employee Rights and Equity Compliance. (Exhibit "X"; Exhibit "W")

    44.    The County of Rockland Office of Employee Rights and Equity Compliance ("OEREC") is not part of the Department of Mental Health. It is a separate body within the Office of the County Executive whose purpose is to investigate claims of sexual harassment and discrimination. (Exhibit "X")

    45.    Under Section IV(3) of the RCEEOP, "no officer, manager, supervisor or other employee… shall engage in any act of discrimination on the basis of age, lineage, color, creed, disability, gender/sex, marital status, national origin, prior non-job related record of conviction, race, religion, sexual orientation or veteran status." (Exhibit "X")

46.    Additionally, under Section IV(7) of the RCEEOP, "department heads, managers, and supervisory personnel must take immediate and, if authorized, appropriate corrective action when allegations of illegal discrimination or harassment come to their attention to assure compliance with this policy." (Exhibit "X")

47.    With respect to discipline, Section IV(8) provides:

> Any person found to be engaging in discriminatory conduct or practices, harassment or other inappropriate behavior (including the failure of a manager or supervisor to report allegations, act appropriately upon them, or discharge their duty to discuss this policy and discourage violation) will be subject to disciplinary action in accordance with the provisions of a negotiated labor agreement or state law as may be appropriate. Based upon the seriousness of the offense, discipline may include a written reprimand, suspension without pay, demotion, transfer, fine, termination and any other measures calculated to eliminate illegal or inappropriate behavior.

(Exhibit "X")

48.    Margot Vazquez, the director of the OEROC at the time, was responsible for investigating and resolving complaints of violations of the RCEEOP. (Exhibit "X" at p. 5; Exhibit "Y")

49.    Ms. Vazquez, who is Hispanic, was charged with the investigation into the allegations of sexual harassment by plaintiff's two female co-workers. (Exhibit "Y")

50.    On June 28, 2005 plaintiff was suspended with pay pending the outcome of Ms. Vazquez's investigation into the two allegations of sexual harassment. (Exhibit "Z"; Exhibit "UU" at paragraph 24)

51.    In the course of her investigation, Ms. Vasquez interviewed nine Department of Mental Health employees, including plaintiff and both complainants, regarding ███.'s and ███.'s allegations. (Exhibit "Y")

52.    During her interview ███. advised Ms. Vasquez that plaintiff hugged and kissed

8

her every morning and evening, tried to kiss her on the mouth, reached towards her rear end, placed his arms around her shoulders while she was working with a patient, tried to look down her shirt, closed the door to her office when he came to see her regarding personal matters, and made frequent sexually explicit comments to her. (Exhibit "Y")

53.    ██. told Ms. Vasquez that plaintiff hugged and kissed her every morning and evening - sometimes on the lips, put his hand on her lower back, reached towards her rear end, put his hands on her while talking, pulled her ponytail while telling her that men like to pull women's ponytails while having sex, cornered her in the locker room and kissed her on the mouth, and grabbed her arm while walking. (Exhibit "Y")

**Plaintiff's Written Statement Establishing Unique
and Unreported Knowledge Of Patient Abuse**

54.    On or about July 18, 2005, plaintiff submitted a written statement to Ms. Vazquez. (Exhibit "AA")

55.    Plaintiff was neither directed nor requested to prepare this statement, but, rather, chose to submit it of his own volition in order to counter the sexual harassment charges made by ██. and Ms. ████. (Exhibit "A" at p.81, lines 3-14.)

56.    In his statement plaintiff accused ██. of having had sexual relations with a male patient, referred to as ██. (Exhibit "AA")

57.    Specifically, plaintiff wrote:

> "██ (████) had again approached me and told me that Nancy Panicucci had called her into her office and explained the Rules and Regulations, regarding patients and staff. ████ told me that Nancy had questioned her because *one of the patients (████████) had told staff that she (████) was dating a patient, and she was afraid that she would lose her job. I didn't know what to do, but I thought that maybe my wife Lisa, who is a Director, might be able to help.*

Approximately a few days later, I was told by one of the patients on the unit that [███] had sex with a patient [███.] while he was a patient on the unit. I was also told that [███.] had been demanding to have his room changed to the annex to be close to ███'s office. Also about this time I had worked an overtime, and [███.] of the evening shift told me that he was going to talk to MD because she was spending too much time around [the patient] and that she often stayed past her usual hours to do so. I was also informed by Mike J, mental health worker that EH had told him that he had seen MD's surgical scars (from her breast reduction surgery last year) and described their location. I was also informed by ███ and ████████ that they has seen [the patient], after his discharge, and he was driving ███'s car. I had asked ███ if these rumors about her were her and [the patient] were true and she denied it. I believed her because I didn't believe she would do that."(Emphasis added)

(Exhibit "AA")

58.     Following his conversation with ███. about her meeting with Nancy Panicucci, plaintiff gained additional knowledge substantiating the alleged sexual relationship between ███. and patient ███.  (Exhibit "AA"; Exhibit "A" at p.95, lines 4-10; p.95, lines 22-25; p.96, line 14-p.97, line 8.)

59.     From the time that he was a Mental Health Aide plaintiff was aware that sexual relations between an employee and a patient constituted patient abuse.  (Exhibit "R"; Exhibit "P"; Exhibit "Q"; Exhibit "A" p.103, lines 21-25; p.104, lines 2-6; p.155, line 8-p.156, line 2; p.157, lines 8-25; 158; p.158, lines 2-14; p.159, lines 6-11.)

60.     From the time that he was a Mental Health Aide plaintiff was aware that sexual relations between an employee and a patient were required to be reported under both agency policy and New York State law.  (Exhibit "R"; Exhibit "P"; Exhibit "Q"; Exhibit "A" p.103, lines 21-25; p.104, lines 2-6; p.155, line 8-p.156, line 2; p.157, lines 8-25; 158; p.158, lines 2-14; p.159, lines 6-11.)

61.     Plaintiff never reported to anyone in the Department of Mental Health the

10

allegations of a sexual relationship between ▮▮. and patient ▮▮. (Exhibit "A" at p.97, line 22-p.98, line 6; p.103, lines 21-25; p.104, lines 2-6; p.104, lines 16-20; Exhibit "II"; Exhibit "SS" at pp. 10-11.)

62.     Plaintiff never reported to anyone in the Department of Mental Health the allegation that ▮▮. had seen ▮▮.'s breast reduction scars. (Exhibit "A" at p.100, lines 17-25.)

63.     After plaintiff learned that ▮▮. was asking to have his room moved closed to ▮▮.'s office, plaintiff still did not report the allegation of a sexual relationship between ▮▮. and ▮▮. (Exhibit "A" at p.96, line 14-p.97, line 8; p.97, line 19-p.98, line 6.)

64.     In addition, plaintiff failed to report the allegation that ▮▮. was seen driving ▮▮.'s car. (Exhibit "A" at p.103, lines 13-16.)

**Plaintiff's Admissions of Wrongdoing**

65.     On July 27, 2005, as part of the investigation into the allegations of sexual harassment, plaintiff gave an oral statement to Ms. Vasquez. (Exhibit "HH")

66.     Plaintiff admitted that his frequent hugging and kissing of co-workers was unprofessional. (Exhibit "HH" at lines 74-99; lines 164-171.)

67.     Plaintiff also admitted that when he observed such hugging and kissing between other colleagues his obligation was to tell a supervisor and intervene. (Exhibit "HH" at lines 74-99; lines 164-171.)

68.     Further, plaintiff admitted having had training in sexual harassment prevention and specifically being trained not to hug and kiss in the work environment (Exhibit "HH" at lines 60-62; lines 89-99; lines 216-223.)

69.     At the conclusion of his interview with Ms. Vazquez, plaintiff stated, "*I'm really sorry about the sexual harassment and stuff like that and I apologize if I offended anybody and*

*I'm sorry for any misconduct that took place.*"  (Exhibit "HH" at lines 646-648.) (Emphasis added.)

70.    At no point during Ms. Vazquez's investigation did plaintiff ever claim that he was being discriminated against.  (Exhibit "A" at p.117, lines 15-25; p.121, line 13.)

**Defendants' Suspension of ▪▪▪. and Her Immediate Resignation**

71.    On July 28, 2005, ▪▪. reported having had an intimate relationship with ▪▪.
(Exhibit "BB")

72.    That same day ▪▪. submitted a letter of resignation effective August 11, 2005.
(Exhibit "CC")

73.    On Friday July 29, 2005, an incident report was prepared with regard to ▪▪.'s allegations.  (Exhibit "DD")

74.    On July 30, 2005, ▪▪. was suspended by the Rockland County Department of Mental Health.  (Exhibit "EE")

75.    Following her suspension ▪▪. never worked another day for the County of Rockland.  (Exhibit "FF")

76.    Following ▪▪.'s suspension Kayeton Kurowski scheduled an interview with ▪▪. to discuss the allegations made by ▪▪.  (Exhibit "GG" at p.35, lines 5-7; p.50, lines 5-7.)

77.    However, as ▪▪. employment with the Rockland County Department of Mental Health had been terminated, the interview with Mr. Kurowski, never took place.  (Exhibit "GG" at p. 35, lines 5-7; p. 50, lines 5-7)

**The Vasquez Decision**

78.    On October 31, 2005 Margo Vasquez issued a Final Report regarding the sexual harassment investigation.  (Exhibit "Y")

12

79.     In her report Ms. Vasquez concluded:

> Although there were no corroboration [sic] of the allegations made by
> ██ . and Ms. ██ , Mr. Ruiz behavior [sic] does give the appearance
> of impropriety.  Therefore, I would recommend the following:

> i.      Mr. Ruiz be moved to another position within the department;

> ii.     Mr. Ruiz be closely supervised;

> iii.    The Rockland County Equal Employment Opportunity Policy be
>         reviewed with Mr. Ruiz;

> iv.     Mr. Ruiz be advised that any violation of this policy would be
>         grounds for a disciplinary action.

(Exhibit "Y")

## The Review of The Vazquez Investigation

80.     In November 2005, Commissioner Walsh-Tozer asked Mr. Kurowski to review
the Vazquez report and supporting material.  (Exhibit "II"; Exhibit "GG" at p.28, lines 4-12.)

81.     Mr. Kurowski reviewed this material, including plaintiff's handwritten statement
that he submitted to the Office of Employee Rights and Equity Compliance on July 18, 2005.
(Exhibit "II")

82.     Mr. Kurowski then spoke with plaintiff who admitted his failure to report
allegations of patient abuse and inappropriate behavior.  (Exhibit "II")

83.     On November 22, 2005 Kayeton Kurowski reported his findings and
recommendations to Commissioner Walsh-Tozer.  (Exhibit "II")

84.     Specifically, Mr. Kurowski wrote:

> 1) Given that Mr. Ruiz did not follow Department procedures regarding
> the reporting of allegation of patient abuse, I recommend that further
> administrative action be taken.

> 2) Given that Mr. Ruiz did not report what he perceived as inappropriate
> behavior in front of patients to his supervisors in violation of Department

procedure, I recommend that further administrative action be taken.

3) Although Ms. Vazquez did not recommend that further administrative action be taken against Mr. Ruiz regarding [█.'s] and [█.'s] allegations of sexual harassment, given that he stated to Ms. Vazquez that he had done the behaviors alleged by [█.] and [█.], I recommend that the issue of further administrative action being taken against him be revisited, as it appears indicated, in my opinion.

(Exhibit "II")

**The First Set Of Disciplinary Charges**

85.    On December 1, 2005 Commissioner Walsh-Tozer preferred two disciplinary charges against plaintiff.  These charges were as follows:

**"CHARGE    I:    GROSS    MISCONDUCT;    VIOLATION    OF DEPARTMENT POLICY; FAILURE TO REPORT ALLEGATIONS OF PATIENT ABUSE**

**Specification 1:** On or about April-May 2005, while employed as a Mental Health Worker II with the Department of Mental Health, you became aware of an allegation that a co-worker █. was dating a patient █. in violation of department policy. You had previously been trained and were aware that an employee dating a patient constituted patient abuse. You had also been previously been trained and were aware that department policy required you to immediately report said allegation to your supervisor.  Not withstanding your knowledge of your obligation under department policy, you failed to report the allegation of patient abuse to your supervisor. When confronted, you admitted your knowledge of the allegation, your obligation to report the allegation and your failure to report the allegation.

**CHARGE    I:    GROSS    MISCONDUCT;    VIOLATION    OF DEPARTMENT POLICY; FAILURE TO REPORT ALLEGATIONS OF PATIENT ABUSE**

**Specification 2:** On or about April-May 2005, while employed as set forth in Specification 1 hereinabove, you became aware of allegations that: (1) that a co-worker █. had sex with a patient █. while █. was a patient in the Unit; (2) another co-worker had observed █. spending too much time with patient █. and often staying with █. beyond her normal work hours; (3) patient █. had seen co-worker █.'s breast reduction surgery scars and could describe their location; and (4) subsequent to █.'s discharge █. was seen driving █.'s automobile. You had been previously trained and were aware that (1) having sex with a co-worker; (2)

14

carrying on any kind of personal relationship with a patient; and (3) exposing oneself to a patient constituted patient abuse and that you were require to immediately report any and all allegations of patient abuse to your supervisor. Notwithstanding your knowledge of your obligation under department policy, you failed to report the allegation of patient abuse to your supervisor. When confronted, you admitted your knowledge of the allegations, your obligation to report them, and your failure to report them.

**CHARGE II: GROSS MISCONDUCT; VIOLATION OF DEPARTMENT POLICY; FAILURE TO REPORT WHAT YOU PERCEIVED AS INAPPROPRIATE BEHAVIOR OF CO-WORKERS IN THE PRESENCE OF PATIENTS**

**Specification:** Over the past eighteen months on numerous occasions, while employed as a Mental Health Worker I or a Mental Health Worker II with the Department of Mental Health you witnessed what you perceived as inappropriate behavior of coworkers in the presence of patients. Said behavior included: On a daily basis co-worker ▐. would come into work and greet other Mental Health Workers (▐., ▐., Mike and Wendell) with a hug and a kiss. On some of these occasions the Mental Health worker ▐. hugged and kissed would grab her waist lift her in the air, and swing her round. On several other occasions co-worker ▐. would sit on co-worker Mike's lap and joke and talk. Said conduct upset you because you felt that co-worker ▐. didn't seem to care about the example she was setting for the patients. You had previously been trained and were aware that department policy required you to report inappropriate conduct of co-workers in the presence of patients to your supervisor. You failed to report any of the foregoing co-worker misconduct to your supervisor. When confronted, you admitted your knowledge of the misconduct, your obligation to report it and your failure to report it."

(Exhibit "JJ")

86.    The notice of charges advised plaintiff that dismissal was sought as the appropriate penalty. (Exhibit "JJ")

87.    The notice of charges further advised plaintiff that, pursuant to the CSEA contract with the County, plaintiff had the option to choose either binding arbitration, pursuant to which an arbitrator would make a final decision regarding factual findings and punishment, or a disciplinary hearing under Civil Service Law §75, a *quasi judicial* proceeding in which the

15

ultimate decision would be made by Commissioner Walsh-Tozer. (Exhibit "JJ")

88.    Plaintiff, by the attorneys representing him in this action, submitted an answer denying the charges and electing a Civil Service Law §75 hearing. (Exhibit "NN"; Exhibit "A" at p.127, lines 8-15.)

89.    In his answer plaintiff did not claim that Commissioner Walsh-Tozer's issuance of these charges was motivated by any form of discrimination, whether on the basis of race, national origin or otherwise. (Exhibit "NN")

90.    In light of the issuance of these disciplinary charges plaintiff was placed on suspension without pay, effective December 1, 2005. (Exhibit "KK"; Exhibit "UU" at paragraph 69.)

91.    Although Mr. Kurowski recommended that the sexual harassment charges be revisited, no charges were filed in this regard. (Exhibit "JJ")

**The Second Rape Allegation**

92.    Just prior to the issuance of these charges, on November 22, 2005, the date of Mr. Kurowski's recommendation, a female patient, ███., reported that Mr. Ruiz had raped her in November 2001. (Exhibit "LL")

93.    The patient alleged that when Mr. Ruiz was alone with her, he told her he was the boss, that he had a lot of power and that if she made trouble for plaintiff, he would kill her. (Exhibit "LL")

94.    In addition to physically penetrating her, ███ claimed that plaintiff repeatedly licked her breasts, calling them "little puppies". (Exhibit "LL")

95.    On November 23, 2005 the charge of rape was reported to the Rockland County Sheriff's Department. (Exhibit "LL")

**The Amended Disciplinary Charges**

96.    On December 21, 2005, while plaintiff was still suspended, Commissioner Walsh-Tozer amended the disciplinary charges to include patient ███'s allegations that she had been raped and sexually abused by plaintiff. (Exhibit "MM")

97.    Specifically, these charges read as follows:

> **CHARGE III:    GROSS MISCONDUCT; PATIENT ABUSE; RAPE OF PATIENT**
>
> **Specification:** On or about November, 2001, while employed as a Mental Health Worker I with the Department of Mental Health, you were assigned to one on one supervision of a female patient ███ who was confined to the In-patient Unit of the hospital because of self mutilation. At the time of such confinement, patient ███. was incapable of consenting to sexual intercourse because she was physically helpless, mentally disabled and/or mentally incapacitated. When you were alone with patient ███. at night you engaged in non-consensual sexual intercourse with patient ███. by forcible compulsion, to wit: you told patient ███. that you were the boss, that you had a lot of power, and that if she made trouble for you, you would kill her. In addition to physically penetrating patient ███., you repeatedly licked her breasts calling them "little puppies". Your misconduct in engaging in sexual intercourse with a patient constituted patient abuse. If proven in a court of appropriate jurisdiction, your misconduct in engaging in sexual intercourse, by forcible compulsion with a patient, incapable of consent, would also constitute a crime (either first, second, or third degree rape under Sections 130.35, 130.30, 130.25 and/or 13-.25 of the New York State Penal Law). In addition to being incapable of consenting to sexual intercourse by reason of forcible compulsion and/or her mental and/or physical disability and/or incapacitation as set forth herein, patient ███. was incapable of consent because she was committed to the care and custody of a hospital and you were an employee of the hospital who was not married to her and who knew, or reasonably should have known, that she was committed to the care and custody of the hospital.
>
> **CHARGE IV:    GROSS MISCONDUCT; PATIENT ABUSE; SEXUAL ABUSE OF A PATIENT**
>
> **Specification:** Your misconduct with patient ███. on or about November, 2001, as set forth in the Specification to Charge III, if

> proven in a court of appropriate jurisdiction, would also constitute sexual abuse, a crime within the meaning of Section 130.05 and130.55 of the New York State Penal Law. Patient ■. was incapable of consent because of the forcible compulsion and/or mental and/or physical disability and/or incapacitation as set forth in the Specification to Charge 111. Patient ■. was also incapable of consent because she was committed to the care and custody of a hospital and you were an employee of the hospital who was not married to her and who knew or reasonably should have known that she was committed to the care and custody of the hospital."

(Exhibit "MM")

98.   The amended notice of charges advised plaintiff that dismissal was sought as the appropriate penalty. (Exhibit "MM")

99.   The amended notice of charges noted plaintiff's prior election to proceed with a disciplinary hearing under Civil Service Law §75, with the ultimate decision to be made by Commissioner Walsh-Tozer. (Exhibit "MM")

100.  Plaintiff, by the attorneys representing him in this action, submitted an answer denying the amended charges. (Exhibit "NN"; Exhibit "A" at p.127, lines 8-15.)

101.  Plaintiff did not claim in his answer that Commissioner Walsh-Tozer's issuance of these charges was motivated by any form of discrimination, whether on the basis of race, national origin or otherwise. (Exhibit "NN")

**The Disciplinary Hearing**

102.  On December 28, 2005, pursuant to Civil Service Law §75 Commissioner Walsh-Tozer designated Ira Lobel as the hearing officer to hear evidence and to report to Commissioner Walsh-Tozer with his recommendations for her review and decision. (Exhibit "OO")

103.  The disciplinary hearing was conducted over the course of four days— February 14, 2006, March 20, 2006, April 19, 2006 and April 21, 2006. (Exhibit "PP")

104.  At the hearing plaintiff was represented by counsel – the same attorneys

representing plaintiff in the matter before this Court – and was afforded a full opportunity to introduce evidence, examine and cross-examine witnesses, and make argument in support of his respective positions. (Exhibit "A" at p. 127, lines 8-15.)

105.   Plaintiff testified at the hearing. (Exhibit "QQ")

106.   During his testimony plaintiff admitted that he observed ▮▮▮. sitting on a male co-worker's lap in front of patients and that he failed to report this behavior. (Exhibit "QQ" at p.655, line 19-p. 656, line 5.)

107.   Plaintiff also testified that he observed other inappropriate conduct between staff members but never reported it. (Exhibit "QQ" at p.656, lines 6-10.)

108.   Plaintiff observed male staff members picking up ▮▮▮. by her waist and twirling her around in front of patients but never reported this behavior. (Exhibit "QQ" at p.666, line 7-p. 667, line 15.)

109.   Plaintiff further testified that he observed a male staff member grab ▮▮▮.'s rear end with both hands and that he failed to report this incident. (Exhibit "QQ" at p.666, line 7-p.667, line 15.)

110.   At another point in his testimony plaintiff testified that he heard a patient, referred to as ▮▮., say that ▮▮▮▮ ▮▮▮▮ and ▮▮. were having sexual relations. (Exhibit "QQ" at p.625, line 2-p.626, line 8.)

111.   In addition, plaintiff admitted that a co-worker told plaintiff that ▮▮▮. was spending too much time with ▮▮. and was staying with ▮▮. beyond her normal working hours. (Exhibit "QQ" at p.632, lines 13-24.)

112.   Thereafter, plaintiff admitted than another co-worker, Michael J., told plaintiff that ▮▮. claimed to have seen ▮▮▮.'s breast reduction scars. (Exhibit "QQ" at p.634, lines 7-

14.)

113.   Michael J. made this statement two days *after* ███.'s meeting with Nancy Panicucci. (Exhibit "QQ" at p.634, lines 15-24.)

114.   Moreover, plaintiff conceded that he had heard that, subsequent to ███.'s discharge, ███. was seen driving ███.'s car. (Exhibit "QQ" at p.635, lines 18-24)

115.   Plaintiff did not report:  (i) ███.'s claim that ███. and ███. were having sex; (ii) ███.'s claim that he had seen ███.'s breast reduction scars; (iii) an allegation that ███. was spending excessive amounts of time with ███. and was staying with ███. beyond working hours; and (iv) an allegation that ███. was seen driving ███.'s car following his discharge.  (Exhibit "II", introduced into evidence at plaintiff's hearing as Employer's Exhibit "J"; Exhibit "SS" at pp. 10-11.)

116.   Plaintiff admitted that he knew he was required to report physical and sexual abuse of patients, including sexual relations between an employee and a patient. (Exhibit "QQ" at p.659, lines 13-21.)

117.   Briefs were filed on or about May 9, 2006 and reply briefs were filed on or about May 16,2006. (Exhibit "RR")

118.   At no time in the course of plaintiff's four day hearing, or in his closing brief, did he ever allege that Commissioner Walsh-Tozer's issuance of charges against him was motivated by discrimination on the basis of race, national origin, or otherwise.  (Exhibit "A" at p.154, lines 2-5; Exhibit "QQ"; Exhibit "R".)

**The Lobel Report And Recommendations**

119.   On June 7, 2006 Mr. Lobel issued his preliminary Findings of Fact and Recommendations. (Exhibit "SS")

120.    Mr. Lobel noted that, "Neither side raised any objection to the fairness of [the] proceedings. (Exhibit "SS" at p.1.)

121.    Mr. Lobel recommended that Commissioner Walsh-Tozer find plaintiff guilty of Charge I, Specification 2—failing to report allegations indicating a sexual relationship between employee ███. and patient ███.[2] (Exhibit "SS" at p. 22.)

122.    In doing so, Mr. Lobel wrote:

> The inconsistency between Respondent's statements in his sexual harassment complaint and the various parts of his testimony at the hearing prevent me from finding Respondent a credible witness.

(Exhibit "SS" at p. 11)

123.    Mr. Lobel then continued:

> *"Respondent may have been the only employee to have heard about the totality of [███.]'s alleged improper conduct with patient [███.]. Given the seriousness of these accusations and regardless of who else knew of these acts, Respondent had an obligation to report them to a supervisor."*

(Emphasis added.) (Exhibit "SS" at p.11.)

124.    Mr. Lobel then recommended that Commissioner Walsh-Tozer suspend plaintiff for thirty days. (Exhibit "SS" at p.22.)

125.    Mr. Lobel also recommended that Commissioner Walsh-Tozer find plaintiff guilty of Charge II – failing to report perceived inappropriate behavior of co-workers in the presence of patients. (Exhibit "SS" at p.22.)

126.    With regard to Charge II, Mr. Lobel recommended that Commissioner Walsh-Tozer issue plaintiff a written warning. (Exhibit "SS" at p.22.)

127.    Finally, Mr. Lobel Lobel recommended that Charges III and IV – those pertaining

---

[2]  Due a typographical error the Findings of Fact section of Hearing Officer's Report and Recommendations refers to "employee DH". However, there was no employee with these initials involved in this matter and the remainder of the Report makes clear that this was intended to be a reference to ███.

to the alleged rape and sexual abuse of patient ███ ████—be dismissed. (Exhibit "SS" at p.22)

128.   With regard to Charges III and IV, Hearing Officer Lobel found credible the accusation that plaintiff referred to patient ██.'s breasts as "puppies". (Exhibit "SS" at p.21 - third full paragraph.)

129.   Mr. Lobel found this reference to be "totally inappropriate". (Exhibit "SS" at p.21.)

130.   However, because Mr. Lobel found that he was, "prevent[ed] from relying entirely on ████████'s credibility," he concluded that he could not sustain a discharge or other discipline based on Charges III or IV. (Exhibit "SS" at p.21.)

**Commissioner Walsh-Tozer's Decision and Findings of Fact**

131.   On August 18, 2006, after reviewing Mr. Lobel's preliminary Report and Recommendations and record, Commissioner Walsh-Tozer issued her findings of fact and decision regarding the charges brought against plaintiff. (Exhibit "TT")

132.   In her decision Commissioner Walsh-Tozer adopted Mr. Lobel's findings of fact as to Charges III and IV and found plaintiff not guilty of the allegations of rape and sexual misconduct. (Exhibit "TT")

133.   Commissioner Walsh-Tozer also agreed with Mr. Lobel that plaintiff was guilty of Charge I, Specification 2, failure to report the sexual abuse of a patient by a staff member. (Exhibit "TT")

134.   Commissioner Walsh-Tozer disagreed with Mr. Lobel's recommendations as to punishment. (Exhibit "TT" at p.2.)

135.   Rather, with regard to Charge I, Specification II, Commissioner Walsh-Tozer

wrote:

> [Y]ou were aware first hand of a relationship which you knew constituted patient abuse between employee [█████.] and patient [███.]. Your knowledge and deliberate failure to report constituted, in my opinion, a most serious breach of your duty to protect the well-being and safety of patients, particularly those suffering from mental illness. You intentionally permitted a patient to continue to be abused by an employee. Such conduct is inexcusable. Therefore, I am terminating you from County service effective this date, August 18, 2006.

(Exhibit "TT")

136.   With regard to Charge II, Commissioner Walsh-Tozer adopted Mr. Lobel's finding of fact that plaintiff was guilty of the charge of failing to report inappropriate behavior between staff members. (Exhibit "TT")

137.   The Commissioner did not adopt Mr. Lobel's recommended finding of fact that this behavior was common knowledge. (Exhibit "TT")

138.   Rather, Commissioner Walsh-Tozer held:

> "I find as fact based upon the record that the misconduct you failed to report was not common knowledge and that you were not singled out for discipline. As a Supervisor of Mental Health Workers, you were trained repeatedly in sexual harassment prevention. You acknowledged to Director of Employee Rights and Equity Compliance, Margot Vasquez that you had been trained, that you knew the conduct you observed was inappropriate and that you had an obligation as a supervisor to intervene and report such conduct. I find as fact that your knowledge of the extent and depth of the misconduct was unique and that, as a supervisor, your failure to report perpetuated misconduct you knew to be wrong and potentially injurious to both staff and patients." [sic]

(Exhibit "TT")

139.   Commissioner Walsh-Tozer then wrote:

> "With regard to Charge II, I also strongly believe that termination from County service is the appropriate penalty. Your deliberate and knowing failure to report inappropriate employee behavior which was potentially injurious to patients renders you unfit for continued service

(Exhibit "TT")

140.   Commissioner Walsh-Tozer then concluded:

> As a supervisor, the failure to report patient abuse and the failure to report inappropriate patient misconduct is equivalent to granting permission to your subordinates to abuse and mistreat patients. Same betrays your fundamental duty to care for and protect patients and threatens the integrity and reputation of the facility with respect to future patients. You did not commit minor infractions. You committed gross misconduct and can never again be trusted with patient care.
>
> You are therefore dismissed from County service effective this date, August 18, 2006.

(Exhibit "TT")

141.   Plaintiff did not appeal Commissioner Walsh-Tozer's decision to the Civil Service Commission, as was his right under §76 of the Civil Service Law. (Exhibit "A" at p.167, lines 7-14.)

142.   Likewise, plaintiff did not file a C.P.L.R. Article 78 action seeking to overturn his termination by Commissioner Walsh-Tozer. (Exhibit "A" at p.167, line 7-14.)


**The Present Action**

143.   On October 17, 2006, plaintiff commenced the present action in which he alleged for the first time that the charges issued by Commissioner Walsh-Tozer constituted discrimination on the basis of race and national origin. (Exhibit "UU")

144.   Plaintiff claims that the alleged discrimination took place in the preferring of charges against plaintiff and the ultimate adjudication by Commissioner Walsh-Tozer. (Exhibit "UU")

145.   At his June 25, 2007 deposition plaintiff testified that his discrimination claim is based upon: (1) certain "letters" prepared by Commissioner Walsh-Tozer (Exhibit "A" at p. 138,

lines 17-23), (2) the belief that white employees who have been "charged with stuff like this" are still working (Exhibit "A" at p.138, lines 6-16); and (iii) his termination (Exhibit "A" at p. 150, lines 9-16).

146.    When asked to describe the "certain letters", plaintiff had no memory of what they said. (Exhibit "A" at p.139, line 3-p.140, lines 10-21.)

147.    With regard to his allegation that Caucasian employees who have been "charged with stuff like this are still working", plaintiff testified that he only believed this to be true and had no actual knowledge one way or the other. (Exhibit "A" at p.143, lines 2-14; p.144, lines 12-23.)

148.    Plaintiff testified that other than the bases set forth in paragraphs "149" through "153" above, there was nothing about the December 1, 2005 Charges (Charges I and II) that led him to believe that Commissioner Walsh-Tozer was discriminating against him on the basis of race or national origin. (Exhibit "A" at p.163, lines 2-6.)

149.    With regard to Charges III and IV—that plaintiff raped and sexually abused a patient—plaintiff characterizes the issuance of the Charges as "bogus". (Exhibit "A" at p.150, lines 21-24.)

150.    A patient did accuse plaintiff of rape. (Exhibit "LL'"; Exhibit "A" at p.150, line 25-p. 151, line 6.)

151.    Plaintiff admitted that a social worker, such the person to whom ███. reported the alleged rape, is required to report such an allegation. (Exhibit "A" at p.152, lines 7-11.)

152.    Plaintiff testified that if he was told that a co-worker had raped a patient, he would tell a supervisor.  (Exhibit "A" at p.152, lines 12-17.)

Dated:    New York, New York
          January 31, 2008

                              SARETSKY KATZ DRANOFF & GLASS, L.L.P.
                              Attorneys for Defendants


                              By: _____
                                       Eric Dranoff (ED-7892)

                              475 Park Avenue South
                              New York, New York  10016
                              (212) 973-9797


TO:    SUSSMAN & WATKINS
       Attorneys for Plaintiff
       40 Park Place, 2nd Floor
       Goshen, New York 10924
       (845) 294-3991

26

SARETSKY KATZ DRANOFF & GLASS, L.L.P.

Index No. 06 CIV 9868                         Year 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JORGE RUIZ,

                    Plaintiff,

           - against -

COUNTY OF ROCKLAND, MARY ANN WALSH-TOZER, sued in her individual
capacity,

                    Defendants.


## LOCAL RULE 56.1 STATEMENT


SARETSKY KATZ DRANOFF & GLASS, L.L.P.
                         Defendants
          Attorney(s) for

              Office and Post Office Address

            475 PARK AVENUE SOUTH
            NEW YORK, N.Y. 10016
               (212) 973-9797
             Fax (212) 973-0939


To

Attorney(s) for

Service of a copy of the within                     is hereby admitted.

Dated,

           Attorney(s) for                  ....................................

**Sir: Please take notice**
☐ *NOTICE OF ENTRY*
that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within named court on                  20
☐ *NOTICE OF SETTLEMENT*
that an order                              of which the within is a true copy will be presented for
settlement to the HON.                                       one of the judges
of the within named Court, at
on the                  day of                  20      at        M.

Dated,

COMPLIANCE PURSUANT TO 22 NYCRR §130-1.1-a
                                              Yours, etc.
To the best of the undersigned's knowledge, information and belief formed
after an inquiry reasonable under the circumstances, the within document(s)  SARETSKY KATZ DRANOFF & GLASS, L.L.P.
and contentions contained herein are not frivolous as defined in 22 NYCRR  Attorney(s) for
§130-1.1-a.
                                              Office and Post Office Address

                                            475 PARK AVENUE SOUTH
                                            NEW YORK, N.Y. 10016
To                                             (212) 973-9797
                                             Fax (212) 973-0939
Attorney(s) for